

**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_                  _Washington, D.C. 20530_

<u>**By Electronic and First Class Mail**</u>

Commissioner Willa Johnson
Commissioner Brent Rinehart                    JUL 3 1 2008
Commissioner Ray Vaughn
County of Oklahoma
320 Robert S. Kerr
Suite 505
Oklahoma City, OK  73102

Re:  Investigation of the Oklahoma County Jail
     <u>and Jail Annex, Oklahoma City, Oklahoma</u>

Dear Commissioners:

    We notified you of our intent to investigate conditions at
the Oklahoma County Jail and Jail Annex ("Jail") in Oklahoma
City, Oklahoma, pursuant to the Civil Rights of Institutionalized
Persons Act ("CRIPA"), 42 U.S.C. § 1997 on February 8, 2003.
Consistent with our statutory requirements, we write to report
the findings of our investigation and to recommend remedial
measures to ensure that conditions at the Jail meet federal
constitutional requirements.  <u>See</u> 42 U.S.C. § 1997b.

    Since we initiated this investigation, we have toured the
Jail on several occasions, specifically, on May 28-30, June 9-13,
and August 27-29, 2003.  Our most recent tour of the Jail was on
April 25-27, 2007.[1]  This letter reports on conditions identified
on our most recent tour during which we inspected the Jail with
consultants in the fields of correctional practices and
standards, correctional health care, and environmental health
and safety.  While on-site, we interviewed administrative and

---

    [1]    For a variety of reasons, several years elapsed between
the two tours.  Despite this opportunity to improve conditions
at the Jail, however, we generally did not observe improved
conditions at the time of the second tour.

EXHIBIT
2

-2-

security staff, health care providers, and detainees.[2]  Before, during, and after our on-site inspections, we received and reviewed a large number of documents, including policies and procedures, incident reports, medical and mental health records, and other materials.  Consistent with our commitment to provide technical assistance and conduct a transparent investigation, we provided extensive debriefings at the conclusion of our inspections, during which our consultants provided their initial impressions and concerns.

We appreciate greatly the cooperation we received from County and Jail officials throughout our investigation.  We also wish to extend our appreciation to Sheriff John Whetsel, Major Bobby Carson, and the staff and administration at the Jail for their professional conduct and timely responses to our requests.

Having completed the fact-finding portion of our investigation, we conclude that certain conditions at the Jail violate the constitutional rights of detainees confined there. As detailed below, we find that the Jail fails to provide for detainees':  (1) reasonable protection from harm; (2) constitutionally-required mental health care services; (3) adequate housing, sanitation and environmental protections; and (4) protection from serious fire-safety risks.

## I.  DESCRIPTION OF THE JAIL

The main Jail facility, operated by the Sheriff's Office, was built in 1991 and is located in downtown Oklahoma City.  It is thirteen stories tall and was originally designed to hold 1,250 detainees, but held 2,543 detainees at the time of our April 2007 tour.  The Jail has a daily detainee/booking of approximately 125 detainees and an average annual detainee/booking of approximately 44,000 detainees.[3]  The Jail Annex, also located in Oklahoma City, occupies the top three floors of the Oklahoma County Courthouse.  The Annex is used as

---

[2]    The Jail houses mainly pre-trial detainees.  However, the facility also houses some post-adjudication inmates.  For the purpose of this letter, both groups will be referred to as detainees.

[3]    Administrative offices occupy part of the first floor. The medical ward is located on the thirteenth floor.  A recreation yard sits atop the roof of the building.  The recreation yard is the only open-air part of the Jail accessible by detainees.

-3-

a short-term holding facility for detainees who are awaiting court appearances in the Courthouse.  The Courthouse and Jail Annex were built in 1936.  Detainees are held at the Annex for short periods of time, usually half a day, while awaiting their court appearances.

The Jail contracts to house detainees from several jurisdictions, including the Oklahoma Department of Corrections, United States Marshals' Service, and the United States Immigration and Customs Enforcement.

## II.  LEGAL FRAMEWORK

CRIPA authorizes the Attorney General to investigate and take appropriate action to enforce the constitutional rights of jail detainees and detainees subject to a pattern or practice of unconstitutional conduct or conditions.  42 U.S.C. § 1997.  The rights of pre-trial detainees are protected under the Fourteenth Amendment which ensures that these detainees "retain at least those constitutional rights . . . enjoyed by convicted prisoners." Bell v. Wolfish, 441 U.S. 520, 545 (1979).  See also Winton v. Board of Commissioners of Tulsa County, Oklahoma, 88 F.Supp. 2d 1247, 1256-8 (D.N.D. Okla. 2000) citing, Lopez v. LeMaster, 172 F.3rd 756, 759 n. 2 (10th Cir. 1999); Garcia v. Salt Lake County, 768 F.2d 303, 307 (10th Cir. 1985); and Barrie v. Grand County, Utah, 119 F.3rd 862, 867 (10th Cir. 1997). Under the Eighth Amendment, prison officials have an affirmative duty to ensure that detainees receive adequate food, clothing, shelter, and medical care.  Farmer v. Brennan, 511 U.S. 825, 832 (1994); Bell, 441 U.S. at 535-36, 537 n.16.  Winton, 88 F.Supp. at 1256-8.  The Eighth Amendment protects prisoners not only from present and continuing harm, but also from future harm.  Helling v. McKinney, 509 U.S. 25, 33 (1993).  This standard has been adopted by the Tenth Circuit.

Detainees have a constitutional right to adequate medical and mental health care, including psychological and psychiatric services.  Farmer, 511 U.S. at 832; Board of Commissioners at 1257-8.  Detainees' Eighth Amendment rights are violated when prison officials exhibit deliberate indifference to their serious medical needs.  See Estelle v. Gamble, 429 U.S. 97, 102 (1976). The standard for adequate medical and mental health care requires a showing of both the subjective and objective components of "deliberate indifference."  Deliberate indifference may be inferred when a prison official "knows of and disregards an excessive risk of detainee health." Farmer, 511 U.S. at 837.

-4-

Detainee living conditions must be "reasonably sanitary and safe." <u>Farmer</u> 511 U.S. at 832; <u>Ramos v. Lamm</u>, 639 F.2d 559, 567 (10th Cir. 1980); <u>Reece v. Gragg</u>, 650 F.Supp. 1297, 1307 (D. Kansas, 1986). When plumbing, electrical and other physical plant deficiencies place detainees at the risk of harm from unhealthy conditions, relief may be warranted under the Constitution. <u>See e.g.</u> <u>Reece</u>, 650 F.Supp. at 1303-1304.

## III.  CONSTITUTIONAL DEFICIENCIES

### A.  <u>Insufficient Protection from Harm</u>

#### 1.  <u>Inadequate Security and Supervision</u>

Several factors make the Jail an unsafe environment for detainees and staff, and have resulted in serious harm to detainees. The Jail houses over 2,500 detainees, nearly double its rated capacity.[4] The facility, however, does not have sufficient bed space for this size population. Throughout the facility, we found detainees sleeping on the floor and three or four detainees locked into two-man cells. The detainees spend nearly 24-hours per day in these cramped quarters.

The large number of detainees, combined with the awkward physical layout of the Jail, makes providing adequate sight and sound supervision of detainees in their housing units extremely difficult. In fact, actual direct supervision of detainees at the Jail is virtually non-existent. The facility is not adequately staffed to maintain necessary supervision of detainees to secure their safety. Indeed, frequent fights or altercations which occur in the cell areas are often the result of inadequate housing unit supervision by Jail staff.

For example, while each housing unit or floor may house upwards of 500 detainees, there are often only one or two detention officers available to supervise the large number of detainees as well as to conduct detainee sight checks. In addition, detention officers assigned to housing units must complete daily logs, conduct safety, sanitation, and security

---

[4]    While overcrowding at the Jail does not create a *per se* constitutional violation, the crowded conditions tax numerous areas of Jail operations and create circumstances that contribute to unconstitutional conditions. For example, as will be further explained in this letter, the excessive number of detainees in close quarters contributes to issues such as increased violence among detainees and the grossly unsanitary condition of cells.

-5-

inspections, and respond to detainee needs.  These detention
officers also are required to perform other duties that require
them to leave the housing unit areas, including escorting
detainees to:  the medical unit, attorney visits, visitations,
court processing; religious programs, disciplinary and
classification hearings, and, at limited times, exercise
activities.  Accordingly, detention officers have little time to
actually monitor detainees.

In addition, detainees are often left unsupervised for
extended periods of time.  For example, our review of the Jails'
Daily Staff Assignment and Inspection Reports for the month of
April 2007 revealed that numerous housing unit security posts are
not consistently staffed.  Staff and detainees also reported that
sight checks for detainees are not conducted as frequently as
needed.

The administration has installed surveillance cameras within
many areas of the Jail, including the housing units, to help
address the lack of detention officers.  However, blind spots
exist within the housing units, such as in the showers and the
inside of the cells, which cannot be monitored with cameras.

Compounding the lack of adequate detainee supervision within
the housing units is the limited visibility into the individual
cells.  Numerous cells are so dark due to detainees covering
their cell windows and cell lights with paper towels, and other
materials, that it is difficult, if not impossible, for detention
staff to be able to provide adequate safety and security checks
of the detainees.  The lack of adequate detention staff available
to adequately supervise detainees exacerbates this problem.



---

[5]   We observed this problem during our first round of Jail
tours in 2003.


[6]   Further, detainees have access to potentially dangerous
items.  Detainees often tamper with cell doors using plastic
utensils ("sporks") that they keep after meals.  These "sporks"

-6-



These examples reflect a major breakdown in security and could potentially result in serious harm to detainees or staff.

### 2.   Inmate-on-Inmate Violence

There is an inordinately high risk of detainee-on-detainee violence at the Jail as a result of the Jail's chronic overcrowding, the staff's inability to supervise detainees, and the ability of detainees to bypass at will the security of their cell doors.  Given all the other security issues discussed herein, the level of violence at the Jail is one of our most significant concerns.  Such violence poses a serious risk of harm to both detainees and correctional staff at the Jail.

Regarding detainee-on-detainee assaults, during a two-month period shortly before our 2007 inspection, the Jail had approximately 70 detainee-on-detainee assaults.  Some of these assaults resulted in death and/or serious injuries.  Incident

can also be used as weapons.  Collecting these utensils after meals would reduce both security and sanitation problems ("sporks" were never intended for repeat use, since they cannot be properly washed or sanitized).

-7-

reports we reviewed about these events documented the following:

- At least two detainees were killed in these assaults.

- One detainee was stabbed during a fight.

- Another detainee received a fractured jaw during a fight.

- Yet another detainee had his eye lacerated during a fight, while a different detainee was stabbed in the eye during a fight.

We reviewed death records covering the years 2005 and 2006. From July 2005 to October 2006, four deaths at the Jail were the result of detainee-on-detainee assaults. The following is a summary of these deaths:

- In March 2006, a detainee died as the result of a dispute over commissary items. Detainees are allowed to purchase, and keep in their cells, large amounts of commissary items, usually foodstuff, which they barter.[7]

- Also, in May 2006, a detainee essentially beat to death his cell mate. The assault occurred in the cell block's dayroom area. In a Jail report we reviewed regarding the assault, a staff member noted "the alleged assailant was observed bragging about how he beat the crap out of" the victim. The victim had a history of mental health issues. The alleged assailant had a violent criminal history and had reportedly complained about the victim's behavior before the beating. After this incident, the assailant had yet another altercation in his cell with another detainee. Such factors typically warrant a careful review by security staff to ensure there was a proper security response. Yet it is not clear what review, if any, ever occurred.

- Another detainee died in November 2006 from injuries

---

[7]    As discussed in more detail in Section D, this situation also presents sanitation and fire safety issues as the material clutters already crowded cells. The food items attract vermin and the packaging provides a potential source of fuel for a fire.

-8-

sustained in an October 2006 assault.  The altercation reportedly began over a breakfast tray.  According to Jail documents we reviewed, the housing unit control center was not staffed at the time of the incident. The officer on duty was called to another area.

- In July 2005, while in a shared cell, a detainee assaulted another detainee in what jail documents describe as "a horrific and brutal" manner.  Following the assault, and after complaining to officers of a seizure, the victim was transported to a local medical center.  He died from cardiac arrest prior to reaching the hospital.

### 3.   Prevalence of Staff Use of Force

As described above, the Jail suffers from overcrowding and inadequate staffing.  As a result, Jail staff frequently resort to the use force to control events.  Although such uses of force are not *per se* inappropriate, between January 2006 and March 2007 there were 1,337 reported use of force incidents.  In the opinion of our expert, this is an inordinately high number of use of force incidents for a facility the size of the Jail.  Of these incidents, 504 involved some type of physical force, 105 involved the use of pepper spray (a chemical compound that irritates the eyes to cause pain, tears, and temporary blindness), 453 involved the use of handcuffs, 35 involved the use of rapid cuffs and 240 involved a planned use of force.  The majority of the emergency uses of force incidents, which involved the use of handcuffs or rapid cuffs, were needed as a result of detainee-on-detainee altercations.  Most of the planned uses of force were the result of intervention on a detainee who was harming himself.  The fact that a detainee was harming himself to the point where staff were forced to intervene may also indicate a lack of needed mental health treatment for these detainees.  Mental health services will be discussed in detail later in this letter.

Additionally, during the tour we reviewed eight video-taped use of force incidents.  These incidents involved the use of a restraint chair or four-point restraints (the practice of binding a detainee to a bed by the wrists and ankles).  In these instances, intervention was initially required due to the detainees' behaviors.  However, we often noted that, by the time the detainees were restrained in the restraint chair or four-point restraints, the detainee was no longer resisting and was compliant to staff orders.  As a result, it is the opinion of our expert that the restraint use was excessive and beyond the need to control the detainee.

-9-

In summary, we believe a number of factors combine to create a dangerous situation at the Jail. First, the lack of adequate detention staff presence within the living areas provides detainees with the opportunity to engage in illicit behavior, including detainee-on-detainee assaults and fights.[8] Second, because detainees tend to be more volatile when living in overcrowded conditions, the likelihood of fights and assaults between detainees becomes greater. Third, there appears to be little interaction between detention officers and detainees, again, due largely to the lack of staff.

    4.   <u>Inadequate Disciplinary and Classification Processes</u>

        a.   deficient administration of detainee discipline

The Jail has a comprehensive policy and procedure governing detainee discipline. While the disciplinary process generally works well and appears to be administered in a fair manner, two aspects of the system that are not functioning adequately are putting detainees at risk and undermining the Jail's ability to effectively control inmate conduct. First, the lack of sufficient disciplinary segregation space at the Jail prevents appropriate separation of detainees who have committed infractions that require disciplinary segregation. The Jail has dedicated 25 cells on the 12th floor for this purpose. However, these cells are also used for administrative segregation of detainees. Twenty-five cells is inadequate considering the large number of detainees who are housed at the facility and the numerous infractions that occur routinely. According to generally accepted standards of practice, seven to 10 percent of the Jail's 1,200 cells should be reserved for special management purposes. Due to an insufficient number of disciplinary cells, the Jail maintains a constant "waiting list" of detainees who have committed various disciplinary infractions that warrant segregated status, but yet who remain in general population and await sanction. The Jail tries to prioritize the more serious offenses for disciplinary segregation. However, during our 2007 visit to the Jail, there were 16 detainees in general population waiting to be transferred to a disciplinary cell to serve their disciplinary sanction. At times, in order to make room for more urgent separation needs, detention staff are forced to let a

---

    [8]   We also note that more Jail staff would also allow detainees greater out-of-cell time, which is currently extremely limited, and would assist in reducing tension among detainees.

-10-

detainee out of a disciplinary cell and back to a general population setting prior to serving his or her full disciplinary sanction.

Serious negative consequences have resulted from this lack of disciplinary cells. Detainees are aware of the problem and the use of disciplinary cells as a deterrent to bad behavior is seriously compromised because the detainee may never have to serve his or her disciplinary sanction. Further, even if a detainee does serve the sanction, it may be very long after the occurrence of the incident and with limited effect. This is unacceptable correctional practice. Generally accepted professional standards require an effective disciplinary system and the means for separating detainees who may be particularly dangerous or disruptive. However, the limited number of disciplinary segregation cells thwarts the implementation of sound correctional practice at the Jail.

In addition to the insufficient cells for use in disciplinary segregation, the Jail staff fails to utilize the existing cells in an appropriate manner. Generally accepted correctional principles require that detainees on disciplinary segregation be housed alone in a cell. The Jail staff routinely place two detainees who are serving disciplinary time in a single cell. This often leads to further disciplinary issues because many detainees serving a disciplinary sanction usually have committed an act of violence, aggression, or other serious infraction. Segregation is intended to punish transgressors and protect other detainees. Placing two detainees in a segregation cell defeats both purposes.

b.    ineffective classification of detainees

Further, although the Jail's classification system appears to be operating in terms of process, it is compromised by the overcrowded conditions at the facility. The Jail does not have enough available cells to match the classification level of the detainees in a way that meets accepted standards of correctional practice. For example, detainees are being triple-celled and in some cases, quadrupled-celled, in order to meet the required classification status and housing.

Notwithstanding that the Jail has adequate policies and procedures for classifying detainees according to their risks and needs, the overcrowded conditions at the Jail make it impossible to cell detainees consistently according to their classification. Thus, detainees are put at risk because the Jail cannot

-11-

adequately separate known potentially vulnerable detainees from
more aggressive detainees.

Similarly, the lack of sufficient staffing impacts the
Jail's ability to implement policies and procedures governing
other Jail operational matters. These policies may be adequate
in writing, but cannot be adequately implemented. For instance,
no matter how professional the staff, their frequent absence from
housing units means that they cannot fully implement standard
procedures on housing supervision; nor can they properly monitor
detainees for inappropriate conduct.

### 5. Deficient Suicide Prevention

Our review of the investigations involving completed
suicides and suicide attempts revealed the Jail's failure to
respond adequately to issues that could help mitigate the success
of these activities. For example, in the post-incident
investigation of a March 2006 suicide attempt of a detainee, the
Jail noted the following issues: the responding officer's radio
battery was dead; the housing unit control center was not manned;
there was not a correctional officer in the pod to provide sight
and sound observation of detainees; the location of the
responding officer was unclear; the victim's cell mate estimated
that it took at least five to 10 minutes for an officer to
respond to his calls for assistance; and there was a further
delay in getting emergency medical services to the cell area.
Ultimately, the victim survived the attempt but suffered severe
brain damage.

Many of these same issues were present when a detainee
killed himself, apparently with tampered razor blades, while in
protective custody in June 2006. The investigative report
describes the scene this way:

> The area between the bunk and desk contained pooled
> blood ... Blood had been dripped or smeared on every
> wall of the cell. The sink was bloody and the water in
> the commode was dark red with blood ... The deceased
> had blood smears over a significant portion of his body
> ..."

At the scene, investigators found a razor blade that had
been removed from a safety razor. The Jail's investigation and
response failed to address whether or not there were a sufficient
number of officers assigned to the unit or whether appropriate
sight checks were done on this protective custody detainee.

-12-

Other detainees have attempted suicide using razors at the Jail. Four months earlier, in January 2006, a detainee attempted suicide by cutting himself with a razor blade. This individual survived but lost a large amount of blood. There was apparently no floor officer available at the time of the incident. The detainee's cell window had been covered, obscuring supervision of the cell. Also, 30 disposable razors were found in the detainee's cell. Three months later, yet another detainee had to be treated at an outside hospital for injuries he sustained by cutting himself with a razor in a suicide attempt.

We also noted that detainees have access to other hazardous items. We noted circumstances where detainees in the general population had stockpiled materials in their cells, such as shoestrings and laundry lines, that could be used by detainees to hang themselves.

During our inspection, it was also clear that housing facilities for suicidal detainees do not include necessary safety features. For instance, cells have ventilation grilles and other fixtures that have not been modified to minimize the risk that they may be used by an detainee to facilitate a suicide attempt. Further, juvenile cells are particularly troubling, because they are painted dark colors, making visibility of the inside of the cell difficult. The bunks are affixed in a manner that makes it possible for a juvenile to tie a ligature to the structure in order to commit suicide.

The foregoing factors further reinforce our general concerns about breakdowns in Jail security and detainee safety. They severely undermine the Jail's efforts to conduct adequate detainee sight checks, to control dangerous items such as razor blades, and to ensure adequate officer coverage of detainee living areas.

6.   Inadequate Investigation of Serious Events

Investigative reports of serious events involving detainees are crucial to a jail administration in identifying, and responding to, potential systemic problems. While the Jail does have an investigatory process, that process is often inadequate to prevent an adequate understanding of the causes leading to an event, or to implement measures to prevent future, similar events. In some instances the investigative reports prepared by the Jail's Investigations Unit lack the detail that would identify operational problems associated with serious events, such as a detainee death or a use of force incident. The Jail

-13-

lacks a formal process for reviewing even detainee deaths for
operational breakdowns.

Additionally, the Jail does not capture, review, or analyze
information about critical incidents in a systematic and formal
fashion.  Indeed, even when investigative reports addressed
operational issues they are of minimal value because the Jail
administrator and the command staff do not have access to them.
Only the Sheriff and Under Sheriff, who are removed from the
day-to-day operations of the facility, review the reports.  The
Jail administrator and the command staff should formally review
and critique all serious incidents in order to address any noted
deficiencies that may arise from the investigations.  We received
no evidence that trend information from these reviews is shared
with the Jail's operations staff.

   B.   Inadequate Health Care Services

        1.   Inadequate Access to Medical Care

Access to medical care is a fundamental right retained by
detainees in the Jails.  Farmer, 511 U.S. at 832; Board of
Commissioners at 1257-8;  See also Estelle v. Gamble,
429 U.S. 97, 102 (1976).  During our tour of the Jail, we
uncovered instances where detainees were not provided adequate
access to medical care, specifically acute services - with dire
results.

While the Jail has a sick call system for detainees to
access routine medical care services, detainees' serious medical
needs are not adequately met.

The facility does not adequately screen detainees for
serious medical problems.  Our review of 45 health records
indicates that the facility does not consistently provide 14-day
health assessment required by generally accepted correctional
medical standards.  Such health assessments are important for
identifying serious health needs and improves the facility's
ability to provide adequate medical and mental health care to
detainees.  For instance, such screenings allow medical staff to
physically examine detainees for communicable diseases, such as
tuberculosis ("TB"),[9] and determine a detainee's medical and
mental health history.

---

   [9]    TB is a potentially life-threatening disease commonly
found in correctional facilities.

-14-

The Jail also has had some problems providing appropriate access to medical care during emergencies.  In a particularly disturbing incident in July 2005, a female detainee gave birth to a three-month premature baby while in a wheelchair and handcuffed to a handrail outside the Jail's medical area.  From reports, it appeared the detainee was handcuffed to the rail from approximately 11:00 a.m. to 9:00 p.m.  She reportedly asked several times to be placed in a cell or some place where she could lay down.  The detainee had reportedly been yelling, cursing to be put back into her cell.  At about 8 p.m., the detainee was seen by mental health staff and was cleared from special precaution status.  Reportedly, the detainee later began yelling that her water had broken.  Medical staff examined the detainee and apparently assumed the discharge was from a bad infection.  She was handcuffed back to the handrail. Shortly thereafter, the detainee was found laying on the ground in bloody water.  An officer reported observing the detainee place her hand down her pants and pull out the baby.  The baby was pronounced dead at a local hospital.  In our expert's opinion, this woman's care was "unconscionable" during the hours she was in critical need of access to medical care.

As noted earlier, when we reviewed the suicides at the Jail, Jail reports indicated there had been critical lapses in getting emergency medical care to detainees.  For example, as described at page 12 of this letter, when responding to finding a detainee hanging in his cell, the officer's radio failed to work, resulting in a delay in accessing emergency medical services. By the time the detainee reached a local hospital, a hospital doctor estimated the detainee had been without oxygen for 20 to 30 minutes and suffered severe brain damage as a result.

2.  <u>Inadequate Mental Health Care</u>

Jail officials violate the Constitution when they exhibit deliberate indifference to detainees' serious mental health needs.  States have a constitutional duty to provide necessary medical care to their detainees, including mental health care such as psychological or psychiatric care.  <u>Riddle v. Mondragon</u>, 83 F.3rd 1197, 1202 (10th Cir. (N.M.) 1996); <u>citing</u> <u>Ramos v. Lamm</u>, 639 F.2d 559, 574 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed. 2d 239 (1981).  When prison officials are deliberately indifferent to a detainee's serious medical needs, they violate the detainee's right to be free from cruel and unusual punishment.  <u>Estelle</u>, 429 U.S. 97, at 104. "A medical need is serious if it is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a

doctor's attention.'" <u>Riddle</u> at 1202, citing <u>Ramos</u>, 639 F.2d at 575.

Other than medicating detainees with Thorazine (which is an older anti-psychotic medication with serious potential side-effects), the Jail offers essentially no mental health services to its seriously mentally ill. As we walked through the Jail, we saw numerous detainees who were obviously suffering from mental illness and in need of psychiatric care and treatment. Yet, many of these detainees appeared to be essentially untreated. Clearly, these detainees required more treatment modalities than they were receiving.

It is quite likely that detainees' mental illness played a part in two of the four deaths described earlier in this letter. For example, in the October/November 2006 death, both the aggressor and victim had mental health problems. The victim had been in psychiatric restraints for agitated yelling and cursing at unknown objects. The assailant had documented psychiatric problems and episodes just days before the incident. A nurse's note at the time indicates that other detainees and security staff had voiced concerns regarding the victim who had been stealing food, going through old eaten trays for food, and was exhibiting manic behavior with some delusions. Jail staff stated the detainee's behavior was "likely to cause him to be harmed by others." Earlier that year, the detainee told the nurse that he had been attacking his cell mates. He also told staff he believed his cell mates were plotting against him and stealing his food. Finally, he informed staff that if he returned to his cell he would hurt himself.

Another major reason the Jail fails to provide adequate psychiatric service is the lack of adequate mental health staff at the Jail. There is only one full-time psychiatrist serving the Jail. During our tour, we received conflicting information about the number of detainees on anti-psychotic medications, but it appeared that at least nine to 10 percent of the detainees were taking these medications. Accordingly, the Jail should have approximately 250 detainees taking anti-psychotic medications. According to the American Psychiatric Association guidelines, the recommended staffing for psychiatrists in jails is one-full time psychiatrist for every 75 to 100 detainees with serious mental illness who are receiving psychotropic medication. Thus, the Jail has less than half the recommended number of psychiatrists serving its detainees.

The Jail's mortality review of the detainee who was killed in May 2006 revealed the detainee also suffered from a

-16-

psychiatric illness, possibly early dementia. Appropriate mental health therapies might have helped mitigate this situation by ameliorating the detainee's psychosis-related behaviors that led him to be the target of other detainees' violent assaults.

Further, and as noted previously, the use of restraints is also problematic at the Jail because it is used in lieu of treatment. This is especially true given the large number of mentally ill detainees in the Jail and the fact that such under-or-untreated detainees often engage in inappropriate conduct as the result of psychosis-rated behavior.

### 3. Inadequate Treatment and Management of Communicable Disease

The Jail fails to adequately treat and manage communicable diseases. The Jail's management of TB[10], Methicillin Resistant Staphylococcus Aureus ("MRSA"),[11] and other infectious diseases deviates substantially from generally accepted correctional medical practices. A significant problem at the Jail is that the Jail does not have adequate systems in place to ensure that these serious public health issues are identified and monitored adequately. For example, Jail records conflicted on the number of MRSA cases present at the Jail. Documents identified from zero to 22 cases 2006. Jail staff were unable to account for the differences in the Jail's own records.

The same unreliable data was present regarding the identification and monitoring of detainees with TB. Jail data reported there were 21 cases of TB at the Jail in 2006. Of these 21 cases, Jail records showed 16 cases happened in a single month: November. Such an occurrence is highly unlikely and raises serious questions about the Jail's system for collecting, monitoring, and recording TB data. According to our expert

---

[10]    The transmittal of TB can be prevented or controlled with an appropriate TB control plan. A TB control plan provides guidelines for identification, treatment, and prevention of transmission of TB to staff, the public, and uninfected detainees.

[11]    MRSA are drug-resistant bacteria that can cause life-threatening illness such as pneumonia, and skin, bone, and bloodstream infections. MRSA is particularly prevalent and virulent in institutions, where many people are housed in close proximity and where basic hygiene may be lacking.

-17-

physician, "these flaws and lack of knowledge regarding the data reported raise credibility and effectivity concerns with respect to the Jail's entire Communicable Disease Management and Infection Control Program."

C.    <u>Deficient Housing, Sanitation and Environmental Protections</u>

1.    <u>Inadequate Detainee Housing</u>

As noted earlier, because of the overcrowding at the Jail, most detainees have very little living space. Detainees sleep under tables, next to toilets, and underneath bunk beds. Detainees are crowded into small cells with little outdoor or even dayroom time. Some detainees have even signed requests not to have a cot because there is no room in their cells for a cot. These cramped conditions breed inadequate sanitation.

In addition, the cells also are unsanitary because of detainees hoarding commissary items. Detainees may order $150 per week of commissary items. As noted earlier, as a result of detainees purchasing food products, cells are filled with litter, inviting vermin infestation, and exacerbating the risk of the spread of infectious diseases, which are already prominent in the Jail. Cells (as noted above) are also rife with suicide hazards.

Conditions at the Annex are also unsanitary. Although the detainees may only spend part of a day in the Annex, the conditions in the facility create the risk of transmission of infectious disease. Detainees have no soap in the cells to wash their hands. Further, the toilet and drinking faucets are small units with the faucet and basin just above the uncovered, foul smelling, filthy commode stool. If a detainee needs water, the detainee has to cup his hand under the faucet and lap water from his hands close above the filth of the toilet bowl.

2.    <u>Inadequate Maintenance of the Jail's Physical Plant</u>

The Jail has a new maintenance system which allows for automated work orders to be generated, but many orders are not being filled due to poor follow-up. We found a number of inoperative showers, leaking bathroom fixtures, inadequate water temperatures, and other unsanitary conditions that had not been corrected for an obviously lengthy period of time. For instance, the water temperature is inadequate to allow detainees to clean themselves appropriately. Shower fixtures were also broken. Given the size of the detainee population, the loss of basic hygiene facilities creates unnecessary health hazards.

-18-

Additionally, because hygiene facilities are in common areas, the near-total lockdown status of the Jail means that detainees often cannot shower for days at a time.

Lack of adequate preventative maintenance was also a major issue at the Annex. Cells were dark and unclean. Cell walls were covered with old and chipped paint to the point where the walls could no longer be sanitized. Toilets were filthy and lacked toilet paper. Sinks had no hot water. Again, with detainees crowded into cells, these such conditions create an environment that fosters the spread of disease and infection, placing both detainees and staff at risk.

### 3.   Unsanitary Food Service Protections

The Jail serves between approximately 7,500 and 8,000 meals daily. This includes approximately 150 "special diet" meals for detainees requiring diets in conformance with religious beliefs or for detainees receiving medically-required special diets for chronic illnesses, such as diabetes or high cholesterol.[12]  While recent renovations at the kitchen have resulted in a modern facility, we noted some deficiencies with food preparation, storage, and handling, which creates a substantial risk of foodborne illness. Further, only one of the food service managers is certified. This can impact upon the adequacy of supervision of the food service operation.

We also observed damaged kitchen equipment and inadequate dishwashing and sanitization practices. For example, during the tour, we saw numerous food trays encrusted with what appeared to be mold and food even after they had gone through the cleaning process. These situations pose a health threat as this potentially allows for growth and spread of bacteria.

We also noted other hazardous issues regarding the Jail food preparations services, including: the lack of hot water for sanitary hand washing; bird and insects getting into areas where food was prepared; inadequate dishwashing practices; and inadequate access to safe drinking water. These factors combine to produce an unhealthy and unsafe environment for detainees as well as for staff who must work in these conditions.

### 4.   Inadequate Pest Control

--------------------------------

[12]    Food service also prepares bologna sandwiches for detainees transferred to the Annex to await court appearances.

-19-

The Jail receives pest control service monthly throughout the facility and in the food service area, and officers and kitchen staff are also able to file work orders for pest issues through the maintenance work order system. When such requests are made, the exterminator is given the list of work orders for necessary follow up. Despite this system, we observed gnat infestation around some showers and garbage containers; gnats can carry germs and diseases and can pose the risk of infecting detainees and staff. Similarly, the Jail also needs to control the amount of food detainees collect in their cells. Large amounts of food in areas that are not properly cleaned, such as the jail cells, can lead to bug and insect infestations. We also observed vermin coming out of drains; a problem that could be eliminated with improved bathroom cleaning.

As noted above, birds fly and roost in the food service area. We also observed that the door from the food service area to the outside has a large gap that allows birds and insects to enter the kitchen from the loading area. This presents a serious danger as birds can carry and transmit diseases.

### 5.   Inadequate Laundry Services

The Jail's laundry operation is not adequate to keep pace with the needs of the detainee population. Generally accepted sanitation standards require routine laundering and cleaning, using appropriate detergent and disinfectant, to prevent the spread of disease causing bacteria, viruses, and insects such as lice. Clothing exchange, including underwear, only occurs once a week. Professional standards dictate that such an exchange take place two to three times per week. Detainees frequently launder their clothing in their cells' toilets or sinks, putting up laundry lines and hanging clothes over apertures. As noted earlier, this practice results in unsanitary conditions and security hazards (e.g., suicide risks). Given the Jail's living conditions and the risks associated with infrequent laundering of detainee clothing, the Jail should consider more frequent clothing exchanges to lessen public health and disease risks.

### D.   Dangerous Life and Fire Safety Deficiencies

Given the size of the Jail population and significant gaps in supervision, fire safety is a grave concern for this Jail. We found serious problems with fire safety training, policies, and safety equipment. Both staff and detainees are in serious jeopardy of injury or death during a fire emergency.

-20-

First, fire safety drills are problematic at both the main Jail and the Annex. At the main Jail, records indicate that most of the staff have had problems recalling appropriate fire evacuation procedures. When we conducted a mock evacuation at the Annex, we were told by staff that "they have never had a fire drill in recent memory." More disturbing, the convoluted Annex evacuation route turned out to be barred by a locked gate, and staff had difficulty finding the key. Should a fire or other emergency occur, such delays could result in serious loss of life.

Second, emergency evacuation routes are not clearly posted in the Jail. This can be catastrophic in a facility that may have to evacuate a large detainee population with very few staff.

Third, fire safety devices are inadequate. The Jail's self-contained breathing apparatuses are not properly secured to prevent tampering and damage. The Annex evacuation route is the only route out of the facility, but because of the age of the building, sprinklers and other safety devices are not present.

The fire safety deficiencies at the Jail are serious enough that we believe careful consideration needs to be given to taking immediate remedial action. The Sheriff's Department also needs to carefully consider whether the Annex can be safely used at all to house detainees.

## IV.  RECOMMENDED REMEDIAL MEASURES

In order to address the constitutional deficiencies identified above and protect the constitutional rights of detainees, the Jail should implement, at a minimum, the following measures in accordance with generally accepted professional standards of correctional practice:

1.  The Jail should ensure that there are a sufficient number of adequately trained staff on duty to supervise detainees and respond to serious incidents in a manner consistent with generally accepted standards.

2.  The Jail should implement policies and procedures to allow adequate supervision of detainees. This should included conducting adequate staff rounds in all housing areas, visually inspecting inmate cells, searching facilities for contraband, and promptly responding to medical and other emergencies.

3.  The Jail should repair and maintain the Jail's physical security features, including cell locks and doors, in

-21-

order to reduce the risk of violence and Jail disturbances.

4.  The Jail should develop and implement an objective classification system consistent with generally accepted correctional standards.  This system should ensure that inmates are separated based on appropriate security factors, including disciplinary status and history of violence.  Detainees should be placed and supervised in housing facilities that are appropriate for their classification status.

5.  The Jail should develop and implement incident investigation, quality assurance and improvement processes that identify areas requiring improvement, prioritize reform efforts, and assist in development of appropriate remedies.

6.  The Jail should ensure the timely assessment, identification and treatment of detainees' medical and mental health care needs.  Specifically, the Jail should:

   a.  Provide adequate medical intake procedures;

   b.  Ensure that qualified medical staff screen detainees properly for serious medical and mental conditions;

   c.  Provide timely and appropriate treatment for detainees with serious medical and mental health conditions;

   d.  Ensure that detainees with chronic diseases receive screening, testing, treatment, and continuity of care;

   e.  Develop and implement a communicable disease plan that allows proper identification, tracking, treatment, and management of communicable diseases;

   f.  Provide medications, including psychotropic medications, in a timely manner.  Treatment, including mental health treatment, needs to be tailored to the inmate diagnoses and individual medical needs;

   g.  Maintain complete and accurate medical records in

-22-

an organized and readily accessible manner.
Physicians and psychiatrists need to periodically
review medical orders and monitor medication use;

h.  Develop and implement procedures to allow timely
mental health and other specialized care for
inmates referred for such care by medical staff.
These procedures should include mechanisms to
obtain medical documents and orders from the
outside medical providers.

i.  Provide medical and mental health staffing
sufficient to meet detainees' serious medical and
mental health needs.  This includes staffing to
provide timely health assessments, mental health
evaluations, medical care, and mental health crisis
and in-patient care.

7.  The Jail should develop and implement policies and
procedures to ensure adequate cleaning and maintenance
of facilities.  This should include mechanisms for
meaningful facility inspections, documentation, prompt
repair of damaged plumbing and other fixtures, and a
regular maintenance process.

8.  The Jail should provide inmates with clean clothing and
linens and should implement adequate sanitary laundry
procedures.

9.  The Jail should ensure that food services are provided
with and proper sanitation and hygiene to minimize the
risk of food contamination and illness.  Kitchen staff
should be trained on food safety and proper food
handling.

10.  The Jail should develop and implement pest and vermin
control procedures in accordance with generally accepted
health standards.

11.  The Jail should provide adequate fire safety consistent
with generally accepted standards.  More specifically:

a.  The Jail should ensure that inmate housing areas
meet generally accepted minimum standards of life
safety.  To that end, all inmate housing areas,
including those at the Annex, should have adequate
fire safety features, such as functioning fire
alarms and evacuation routes, and adequate numbers

-23-

      of hygiene facilities, including properly
maintained wash basins and toilets.

b.     The Jail should ensure that fire and life safety
equipment, including communications gear, is
functional and properly maintained. Staff should
be trained on such equipment.

c.     The Jail should regularly train and drill staff on
fire and emergency procedures;

d.     The Jail should development and implement policies
and procedures to ensure adequate control of fire
and safety hazards such as chemical supplies,
razors, and materials that can contribute to
excessive fire loading.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Please note that this findings letter is a public document.
It will be posted on the Civil Rights Division's website. While
we will provide a copy of this letter to any individual or entity
upon request, as a matter of courtesy, we will not post this
letter on the Civil Rights Division's website until ten calendar
days from the date of this letter.

We hope to continue working with the County in an amicable
and cooperative fashion to resolve our outstanding concerns
regarding the Jail. Assuming there is a spirit of cooperation
from the County and the Jail, we also would be willing to send our
consultants' evaluations under separate cover. These reports are
not public documents. Although the consultants' evaluations and
work do not necessarily reflect the official conclusions of the
Department of Justice, their observations, analysis, and
recommendations provide further elaboration of the issues
discussed in this letter and offer practical technical assistance
in addressing them.

We are obligated to advise you that, in the entirely
unexpected event that we are unable to reach a resolution
regarding our concerns, the Attorney General may initiate a
lawsuit pursuant to CRIPA to correct deficiencies of the kind
identified in this letter 49 days after appropriate officials have
been notified of them. 42 U.S.C. § 1997b(a)(1).

We would prefer, however, to resolve this matter by working
cooperatively with you and are confident that we will be able to

-24-

do so in this case.  The lawyers assigned to this investigation
will be contacting the County's attorney to discuss this matter
in further detail.  If you have any questions regarding this
letter, please call Shanetta Y. Cutlar, Chief of the Civil Rights
Division's Special Litigation Section, at (202) 514-0195.

Sincerely,

/s Grace Chung Becker

Grace Chung Becker
Acting Assistant Attorney General

cc:  David Prater, Esq.
     Oklahoma County District Attorney

     John Whetsel
     Sheriff
     Oklahoma County

     John C. Richter, Esq.
     United States' Attorney
     Western District of Oklahoma